(74 South. 179)

No. 20878.

WALLACE v. TREMONT & G. RY. CO.

(Jan. 15, 1917. Rehearing Denied Feb. 12, 1917.)

*(Syllabus by the Court.)*

1. MASTER AND SERVANT ☞163(1)—MASTER'S DUTY—NUMBER OF SERVANTS.

It is the duty of a master to see that the number of servants engaged on any particular work is sufficient to secure the reasonable safety of each one of them.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 328, 329.]

2. MASTER AND SERVANT ☞101, 102(1) — MASTER'S DUTY — TOOLS, APPLIANCES AND PLACE FOR WORK.

The duty of a master to furnish proper tools, appliances, and a safe place, embraces human instrumentalities and mechanical devices.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 135, 171, 178, 179.]

*(Additional Syllabus by Editorial Staff.)*

3. MASTER AND SERVANT ☞112(2) — INJURY TO SERVANT—NEGLIGENCE.

Where it appeared that the cross-ties at the place of the accident were decayed, and that the passing of the train over the joint in the track in that place caused a "low joint" and the cars to rock in going over it, the master was liable for injury to a brakeman falling or jolted from a car he was climbing.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 212, 219.]

4. DEATH ☞99(4)—DAMAGES.

In an action by the widow of a brakeman for damages for his death, where it appeared that deceased was a young man, earning from $60 to $75 a month, married, and with one child, a verdict of $9,000 would not be reduced.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125, 126, 129.]

Appeal from Fifth Judicial District Court, Parish of Winn; W. L. Bagwell, Special Judge.

Action by Mrs. Ada Machen Wallace against the Tremont & Gulf Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Stubbs, Theus & Grisham, of Monroe, for appellant. Hundley & Hawthorn, of Alexandria, for appellee.

SOMMERVILLE, J. O. K. Wallace, husband of the plaintiff, while employed as brakeman of the defendant, received fatal injuries from which he died within 12 hours; and this suit is for damages, under allegations of negligence on the part of the employer on the ground that the train crew was insufficient in number, and that the track over which the train was being operated was defective. The answer admits the injury and death, but denies that the accident was occasioned by any fault or negligence on the part of the defendant, and avers that same was occasioned by negligence on the part of plaintiff, with the additional allegation of assumed risk.

There was judgment in favor of plaintiff and against defendant in the sum of $9,000, and the defendant has appealed.

The train upon which the deceased was serving as a brakeman was a mixed train, running from Tremont, La., to Winnfield, thence to Rochelle, then going back over a portion of the same line running between Tremont and Winnfield to a junction point known as Minnifee, then to Tremont, on the same day.

While at Minnifee, it appears that some switching became necessary to make up the train, which was a mixed one composed of both passenger and freight cars, upon which the deceased was acting as brakeman.

The evidence shows that prior to the time of the accident two brakemen had been employed on this mixed train; but, on the day of the accident, the second brakeman failed to arrive on time, and the train was ordered

to move without the second brakeman. The evidence further shows that there was work for two brakemen on the train, and that the train crew was insufficient in number because of the missing brakeman.

T. J. Roberts, yardmaster of the Louisiana & Arkansas Railroad, testified on behalf of plaintiff that the necessary crew to handle a mixed train, like the one in question, would be two brakemen, conductor, engineer, and fireman. And, asked why two brakemen instead of one were necessary, he said:

"If the man had a car to set out—suppose a man had a car to cut out on a curve, if one man had to do it, the engineer could not see him give the signal, but if there were two and they had a car to set out, one man could cut it off and the other man would set it."

De Loach, conductor on the Louisiana Railway & Navigation Company, testified: That one brakeman was not sufficient to operate a mixed train, "because the work the railroad company requires you to do on such routes is such that you must have a full crew." That if he did that work for 12 hours, "he would be all in at that time—I would. He would be all in before that time." That it was necessary to have two men, because, "one man cuts the cars off, uncouples the cars, and another man throws the switch; and if it is on a grade, one of them will have to go on top and set a brake." Asked whether he had ever been a conductor on a mixed train which used only one switchman, he answered, "Never in my life." When asked whether a mixed train might be operated with one brakeman in safety, he replied: "Well, sir, I say it cannot be operated with safety with one man, and I never worked for a road that did that."

[1] The absence of the second brakeman of the train crew was known to the train dispatcher of the defendant company, and the mixed train was sent out without this second brakeman. The evidence is clear on the point that the work requires that there should have been two brakemen in the crew; and that the crew with only one was insufficient.

In the case of Hill v. Lumber Co., 108 La. 162, 32 South. 372, 58 L. R. A. 346, while an employé was temporarily absent through accident, and a fellow workman's life was thereby endangered, the court say, in part:

"It will not do for defendant corporation to argue it had enough men behind the edger to do the work there. It was its duty to have had a sufficient number of men there, not only to do the work, but to do it with safety to those working in front of the edger.

"If Adam Cosman could not leave his post for five minutes without danger and death attending on his absence, the master should have provided against that contingency. There should have been an extra man there for just such purpose."

[2] In a similar case, where loaded coal cars in a mine got beyond control, owing to there being one man in charge instead of two, the Supreme Court of Virginia held the company responsible in damages. South West Improvement Co. v. Smith, 85 Va. 306, 7 S. E. 365, 17 Am. St. Rep. 59. It is well recognized that it is as much the duty of the master to furnish a sufficient number of servants to perform the duties assigned to them in a reasonable manner as it is to furnish them with a reasonably safe place in which to labor. It is the duty of a master to furnish proper tools and appliances for the safety of his employés, and this includes human instrumentalities as well as mechanical devices. Hyland v. Telephone & Telegraph Co., 70 S. C. 315, 49 S. E. 879; Illinois Central R. R. Co. v. Langan, 116 Ky. 318, 76 S. W. 32, 25 Ky. Law Rep. 500; Chesapeake & Ohio Ry. Co. v. Board, 25 Ky. Law Rep. 1118, 77 S. W. 189; Peterson v. American Grass Twine Co., 90 Minn. 343, 96 N. W. 913; Hilton v. Fitchburg R. R. Co., 73 N. H. 116, 59 Atl. 625, 68 L. R. A. 428; Denver & R. G. R. R. Co. v. Reiter, 47 Colo. 417, 107 Pac. 1100; Brown v. Rome Machine Co., 5 Ga. App. 142, 62 S. E. 720; Standard Sani-

tary Mfg. Co. v. Minor, 33 Ky. Law Rep. 972, 112 S. W. 572; Meily v. St. Louis & S. F. Ry. Co., 215 Mo. 567, 114 S. W. 1013; Di Bari v. J. W. Bishop Co., 199 Mass. 254, 85 N. E. 89, 17 L. R. A. (N. S.) 773, 127 Am. St. Rep. 497; Coughlan v. Philadelphia, B. & W. Ry. Co., 6 Pennewill (Del.) 242, 67 Atl. 148; Penn. Co. v. McCaffrey, 139 Ind. 430, 38 N. E. 67, 29 L. R. A. 104.

[3] The evidence shows further negligence and fault on the part of defendant company. At the place of the accident it is shown that some of the ties were decayed to such an extent that the rails dipped while the cars were passing over them; and, it is to this dipping and jostling that the deceased attributed the accident which befell him, and which resulted in the loss of his life. Portions of the cross-ties under the tracks, where the tracks were joined at the place of the accident, were produced in court, and they showed very great decay. Two witnesses testified that they went to the place and saw the passing of a passenger train as it went over that point in the track; and they testified that the rails dropped there when the train passed over it. The witnesses for the defendant testified "that the engine (in passing over the point) didn't rock much." But it did rock; and this made it an unsafe place for the deceased to have worked in.

The surgeon of the defendant company testified as a witness for that company, and said:

"I asked him (the deceased) how it happened, and he prefaced his remarks by saying, 'Blank carelessness.' He told me that they had some cars to set out, and he got on the cars to ride them back to where they were going to set them out, and going on back he had one foot on the journal box and was holding onto the iron of the car, and that the car jolted for some reason; he didn't know what, and he slipped off. I asked him if he had both feet on, and he said he had one foot on the journal box and was trying to cut off the air with the other. I asked him if there were a bad track, and he said he didn't know; that something jarred him loose and he slipped off. He said it was something which caused his foot to slip off, and he supposed the car jolted."

The plaintiff testified that the deceased had made a somewhat similar statement to Dr. Peters, after the deceased had been taken to his home. She says:

"He said that he had uncoupled the car, and had started up to apply the brakes, and that when he put his foot on the journal to climb up on the car the car dropped down from some cause and threw him over."

The evidence is positive that the cross-ties at the place of the accident were in a very decayed condition, and that the passing of the train over the joint in the track at that place caused the joint known as a "low joint," and that the cars rocked in going over it. The deceased attributed the accident to the rocking or jarring of the car that he was attempting to climb at the time of the accident; and defendant is clearly responsible for what happened to the deceased at that unsafe place.

"Railroad companies should provide safe roadbeds, the cross-ties should be sound and the rails strong and securely laid." Syllabus, McFee v. Railroad Co., 42 La. Ann. 790, 7 South. 720; Rutherford v. Railroad Co., 41 La. Ann. 793, 6 South. 644; Fuller v. Tremont Lumber Co., 114 La. 266, 38 South. 164, 108 Am. St. Rep. 348. In the latter case it is said:

"A railroad company must maintain a safe roadbed, undecayed and sound cross-ties, and see that the rails are in their proper position and level; * * * or else, in case of an accident growing out of its unsafe condition which caused injury, it will be liable."

[4] The district judge has allowed plaintiff the sum of $9,000, which he says is in line with the decision of this court in Cross v. Lee Lumber Co., 130 La. 66, 57 South. 631.

The deceased, was a young man, earning from $60 to $75 a month; married, with one child. The child is not a party plaintiff in this litigation.

The amount allowed by the district judge

is, in our opinion, about fair. In the case of Dobyns v. Yazoo & Mississippi Valley R. R. Co., 119 La. 72, 43 South. 934, where the deceased was a railroad conductor earning about $100 a month, the court reduced the verdict from $25,000 to $10,000.

In the case of Eichorn v. New Orleans & C. Ry., Light & Power Co., 112 La. 236, 36 South. 335, 104 Am. St. Rep. 437, the sum of $10,000 was allowed the plaintiff for the death of her husband, who was earning from $200 to $250 a month, and was 39 years of age.

In the more recent case of Broussard, Widow, v. Louisiana Western Ry. Co., 140 La. 517, 73 South. 606, the court allowed the widow $5,000, and each of the children $2,-000, making a total of $15,000.

There is no sufficient reason apparent why the judgment of the lower court should be reduced; and it will be permitted to stand.

Affirmed.